Case number 20-1471, Intelliquent, Inc. petitioner versus Federal Communications Commission and United States of America. Mr. King for the petitioner, Ms. Citrin for the respondents, Mr. Horvitz, amicus curiae. Good morning. Good morning, Mr. King, Ms. Citrin, Mr. Horvitz. Mr. King, we'll hear from you first whenever you're ready. Morning, your honors. May it please the court, Kevin King for petitioner Intelliquent. Your honors, this case is very different than the preceding one. This one concerns the FCC's toll-free calling order, and in particular, the one-tenth of a cent per minute rate cap imposed by that order. Your honors, we would submit that the rate cap should be set aside because the FCC failed to comply with the APA's requirement of reasoned decision-making. I'd like to focus on two aspects of that problem today in particular. First, the FCC's arbitrary and inconsistent treatment of the rate data submitted by Intelliquent. And second, the FCC's near total deference to a deal struck by U.S. Telecom's large, well-connected member companies. Is it the case that neither set of data is really complete or representative, neither Intelliquent's nor U.S. Telecom's? Yeah, with respect to costs, I would concede that neither of them gives a direct, clear picture of current costs for Tandem Services. And for that there's a historical linkage between our data and costs, but I'd prefer today with the court's indulgence to focus on our arguments about rates and why they're relevant. And one of the reasons I want to do that is the studies submitted by Intelliquent and U.S. Telecom spoke to the same basic thing, the national average for current rates charged for Tandem Services. You've got apples and apples between those two. And yet, nevertheless, the FCC treated them inconsistently, right? The FCC's approach, adopting U.S. Telecom's proposal while dismissing similarly situated, conflicting evidence submitted by Intelliquent, was arbitrary and capricious. That's really our first argument here today. Our model showed a nationwide average rate of 1.7 tenths of a cent per minute based on a broad and comprehensive data set consisting of more than 3 billion call minutes per month, the vast majority of which were drawn from jurisdictions served by low-cost providers. As T-Mobile said in its comments, Intelliquent's model provided a reliable nationwide profile of toll-free calling traffic. Dr. King, could you maybe just explain a bit what you expected the FCC to do here? So you can see that there is no reliable cost data on either side, and you suggest you need the 1.7 tenths as opposed to the rate that they adopted. But how was the FCC supposed to choose between the two of them? Did you expect them to pick a midpoint? What did you exactly want them to do with your proposed rate as opposed to U.S. Telecom's proposed rate? Sure. Two responses, Judge Rao. I do want to clarify what I said earlier. We do think that there is historical linkage, not a perfect direct one, but we do think that our rate data did shed some light on costs and that the agency should have taken that into account in some fashion. Again, setting that aside and focusing just on what the agency should have done with respect to current rates, our point is not really that the FCC should have been constrained in picking our rate or U.S. Telecom's. We're not here today arguing that the FCC was compelled to select our proposed 1.7 tenths of a cent per minute rate. Instead, what we think the FCC needed to do was treat our data consistently with U.S. Telecom's since they both spoke to the same exact topic, an average of current rates, and it needed to give a reasoned explanation. If it's going to choose U.S. Telecom's proposal, 1 tenth of a cent per minute, it needed to explain why that proposal better served the order's goals than ours did. It needed to compare the two and work with them. As this court said in the genuine parts case, and as this court said in business roundtable, Judge Ginsburg, a decision that you authored, the agency has a duty to address conflicting data. We're not really saying what they needed to do after they addressed that conflicting data. We're simply arguing that they needed to address it. Isn't a central aspect of your challenge though that the rate that was set doesn't adequately take into account cost, but you never provided the commission with any data about the specific cost for your services, for IntelliQuint services, did you? We did not. The narrow point there, we would concede we never provided IntelliQuint's cost data to the court. We don't actually know whether today, I mean, I know that you have a tariff and that there's an implication there that a higher rate was approved and the tariff is still valid, but one of the responses I take the commission to have made to that was, yeah, it's still a valid tariff, but costs have actually really reduced radically over time. It's really not reasonable. I know there's a little bit of sparring back and forth in the briefing, but it's not really reasonable to think that costs in fact are as high as they were when that tariff was set. Well, I mean, you know, the tariffs were initially, the price caps were initially set in 1990 based on actual costs, and then the FCC's periodic downward adjustments to account for efficiency gains. And you can have a debate about, you know, sort of how, you know, how reliable, you know, current price caps are in terms of reflecting, you know, current costs. They're, you know, in our view, there is some relationship there. You can debate how strong it is, but again, even if you credit entirely the FCC's cost concerns, the order is still arbitrary and give a reason to explanation for treating our data differently than U.S. telecoms. You know, both of them spoke to the same issue, yet the FCC adopted U.S. telecoms and brushed ours aside, even though the costs objection that the FCC raised with respect to our data applies equally to U.S. telecoms data, right? I don't know if this is really, I mean, you could flip that and say, you know, you're advocating the commission shouldn't base a national rate on any one provider's data, but you're basically saying, well, they should have relied on ours, which would have been subject under your theory to the exact same challenge from U.S. telecoms. So what would have been your defense had the commission embraced your data and not U.S. telecom? Well, I think if, well, I'm trying to think this through. If the agency had embraced our data after comparing the two and considering both of them and not just sort of brushing one off on an irrelevant, inconsistent ground and sort of, you know, gone through the paces and explained which of them better serves the order's various objectives, I don't know what our defense would have been. But again, that's not what the agency did here. The agency brushed ours aside on cost grounds, grounds that apply equally to both data sets, and then proceeded to, without really any further reference to ours, just to adopt wholesale U.S. telecoms proposal. Didn't the FCC in part suggest that the IntelliQuint proposal would better prevent arbitrage for toll-free numbers, right? And was there any evidence that your rate would do, would have the same impact? I don't think, as to your first question, Judge Rao, I don't think there's anywhere in the order, and we've spent a lot of time with this order, as I'm sure you and your clerks have. There's nowhere in there where the FCC says U.S. telecoms proposal is going to better deter arbitrage than that. Mr. King, the point was, though, that any lower price would reduce arbitrage, because the opportunities for arbitrage would be reduced. Yeah, and so our rate, Your Honor, our proposal, which we're not arguing the FCC was required to accept, but ours would be, you know, a nationwide weighted average, right? So, you know, half the rates out there in the world would come, would be above it and would need to come down. So there would be substantial You say it's a nationwide weighted average, but it's based only on your data. You talk about the very large, you know, billion data points, but it's only, again, like U.S. telecoms, only a subset of the market, right? A nationwide, but nonetheless subset. Well, I guess I resist that a little bit, Your Honor, because, for a few reasons. One of them is the FCC's benchmarking rule, right? When a competitive provider provides tandem service under the benchmarking requirement, it must peg its rates to the local incumbents, right? And so the rate cap for a competitive provider is going to be tied to that, you know, that local incumbent. And so, you know, IntelliQuint provides service nationwide, 49 states. So we're tying our, benchmarking our rates to a wide range of different incumbents, which means our data is nationwide and it takes into account not just large providers, which is what U.S. telecom looked at exclusively, but also data from smaller providers. That's a really nice point. And that's in your comments in the record? Where is that in the record? It is. If you look at page, I believe it's 92 of the record footnote five, but let me verify that for you. Yeah, that's right. JA92 footnote three. We explain that the 10 miles of transit, and I'm sorry, one other citation for you on that. JA268 footnote five, we explained that we take into account data from areas served by smaller providers. So you do have this difference, right? Our data is a weighted national average. U.S. telecoms is an unweighted survey only of areas served by large providers. And we don't even really know which large providers U.S. telecom surveyed, right? U.S. telecom has both large and only their large numbers. We know for a few reasons, Judge Ginsburg. One is that that's what they said. They represented, their second letter, they said that they had a unanimous approval from their membership. They have unanimous approval from their membership. I don't think the record discloses what their membership is, but the one 10th of a cent per minute calculation is by its terms, the approximate midpoint of the rates currently charged by U.S. telecom's larger members. That's what the FCC said in the order. But apparently the smaller members are happy enough to live with it, right? It appears so, but I guess, Your Honor, what I'd say in response to that, and if you look at the Fifth Circuit's decision in Texas office, which draws on reasoning from this court's precedent, even unanimous agreement among industry stakeholders is not sufficient. Agencies are not permitted to cede near total deference to those kinds of agreements. And here, the agreement among the industry was not unanimous, right? You had a number of providers, including IntelliQuint, T-Mobile, Peerless, and others who were challenging U.S. telecom's approach. And so, Judge Pillar, just to come back to something you were saying, and I think Judge Rau, you were raising this as well, is there evidence that IntelliQuint's proposal would have well served the order's goal of deterring arbitrage? Yes. We supported that arbitrage. And if you look at our comments, I think at 92 to 96, and also T-Mobile's comments, the disinterested third party at JA-275, they say that our approach would be well equipped to deter fraud and abuse. So, you had record evidence that was conflicting with the conclusion the agency reached, and yet the agency brushed that evidence aside on irrelevant, arbitrary, selective grounds. And that really… There were rates out there that were in excess of, I believe, four cents in some cases, correct? So, any rate below that will remove some opportunities for arbitrage. As I understand the agency's intention here and their order, they set out to do something as soon as they could to reduce arbitrage on an interim basis because they are ultimately going to revisit this and devise some kind of bill and keep or other system. So, this is saying, well, look, what can we do in the interim that will be quick and dirty, right? And here's our explanation. These people have agreed that this would work at one cent. We got a few outliers here who are complaining about one cent. Well, they can seek a waiver if they can make a cost showing that one cent doesn't recover all their costs. Sounds like a perfectly reasonable way to get a way station, I mean, to get to ultimately toward their goal. Your Honor, a few responses to that. I'll start with the outliers point. There's no data in the record to show that the carriers, I think it's Orion and another one, are necessarily outliers. Again, we've got the data, which the FCC hasn't challenged. If they're getting in excess of four cents and identified as being on the very high end of the spectrum. Yeah, I think our point is that IntelliPoint did this sort of broad nationwide study and we showed a weighted national average of 0.17 cents per minute. And so, you've got half the rates that are out there in the world are going to be above that. It's based on your experience and your study, based on your own data. And yeah, so even if it were, let's assume that your study is superior in any all relevant respects in terms of accurately reflecting what costs? No, rates. We're talking here about what are the rates out there in the world? You're setting a price cap. The agency is setting a price cap. They're not interested in rates. They're interested in costs. On the contrary, the order says they're not looking at costs. It says they're just looking at rates. And again, they adopted lock, stock and barrel US telecoms proposal, which was the approximate midpoint of current larger providers, current rates. So if that's the right metric, that's our submission. I misspoke there. They're looking at rates and trying to set a rate that is untethered to costs for the, and I say, no, all of the, the large portion of the industry, indeed, the great majority of it can live with that. They're not unhappy with that. And they know that there are a few people who are not going to be happy with that. Well, again, I guess two responses, your honor. First is that under the Texas office case, which is from the fifth circuit relies on this court's precedent. The fact that some people, some part of the industry is happy with the rate is not an adequate basis to adopt that rate, especially when there's competing equally situated data showing that that that rate is not representative. I think the point of that in the case there, if I remember correctly, was that the agency can't just rely on the waiver process, you know, and say, well, we don't really know how many people are going to, this won't really work for them, but they can rely on the waiver case here. The agency knows that it does work for the vast majority of the industry. Your honor, I guess, again, our challenge and you don't have to take it from us. You can take it from T-Mobile at JA-275 is that it doesn't work for the vast majority of the industry and that us telecoms approach would not better serve the order's objectives. All we're asking for here is a pretty narrow move on the FCC's part to analyze our data, you know, in the rate making analysis, to factor it into that analysis on equal terms with US telecoms. They don't have to adopt ours. All they have to do is give a reasoned explanation for why one is better than the other. That reasoned explanation is nowhere in the record. And so this case really is on all fours with genuine parts where the agency overlooked relevant conflicting data. And what this court said is you can't do that, right? The FCC invokes rate making difference and, you know, cases about judgments, but the error here doesn't implicate those precedents. Our challenge focuses on the decision making process that led to selection of the rate cap and not the accuracy of the rate cap itself. So, Mr. King, I understand the sort of framing that you just gave, but is the underlying concern that the rate that the FCC chose would not cover costs for providers of tandem services, especially those that aren't diversified and so can't kind of internally cross-subsidize? Is that the core sort of fairness concern, if you will? I think that's a big part. I don't think it's the only part. I think, you know, there's a concern here that there was a backroom deal put together by US telecoms, large members, and they went and presented it and the FCC just sort of took it hook, line, and sinker and then backfilled the legal analysis. And so we're concerned about that too. We're concerned about process as much as we are substance. But yes, you know, there's a concern that, you know, for providers who, you know, have this legacy service, the so-called TDM service, not the IP modern service, that, you know, it's going to undercut them in a really meaningful, problematic way. And again, I keep coming back to T-Mobile. If you look at 275 in the appendix, you'll see they say taking US telecoms approach is going to slow down progress in terms of transitioning to IP networks because providers like IntelliQuint help facilitate that process. Competition helps facilitate that process. But here, what US telecoms powerful members are doing is undercutting that competition. And I understand that your primary point is that explanation should have been fuller with respect to the choice of US telecoms data versus your data. But is there, is there evidence in the record of providers of tandem services, TDM providers whose costs won't be covered and who aren't diversified in a way that allows them to survive this? Or is that just sort of in the background of the data? I think there is some evidence of that nature in the record. And I would point in particular to a company called Orion, A-U-R-E. Right. We've seen, so Orion is what you'd point to? I think that's the best example. I'm not sure it's the only example. I'd be glad to file a 28J if you'd like to hear more on that issue. No, I think we're on letters plenty. Do my colleagues have further questions? No, thank you. All right. Well, Mr. King, we will give you, as a customer, even though we've run you out of your time, we'll give you some, some time for rebuttal. And now we'll hear from Ms. Citrin for the commission. Good morning, your honors. Sarah Citrin for the FCC in the United States. I think that the discussion that's come before really illustrates how narrow the dispute is in this case. We agree about a lot of things. And I think that the questions from your honors indicate that you understand the commission's position quite well. There was no, no evidence in the record on current costs of providing these services, that FCC didn't have that to go on. And there was also no dispute, or at least IntelliQuint doesn't dispute that arbitrage was a real problem that the commission reasonably sought to address. And that other things being equal, by which I mean, a rate that two rates that were both adequately consent compensatory, as between two rates of that nature, as Judge Ginsburg said, the lower rate would better serve the commission's policy goal of deterring arbitrage. So the question really becomes, did the commission have substantial evidence to conclude that the proposed rate cap from US Telecom would be adequately compensatory for all or nearly all carriers? And I'd like to- I guess the nub of what I take to be behind Mr. King's challenge is, how does the commission know that each of these rates is, as you put it, adequately compensatory? Because I think everyone agrees that there wasn't systematic cost data in this record. And if it's your burden as the rulemaker to come up with a rule that's non-arbitrary, why is that not a flaw? Yes, your honor, the commission, I think it's clear from the order, a number of different led it to conclude that this rate was adequately compensatory. One of those, if you'll look at JA 367 footnote 216, there were a number of existing tariff rates that were already at or below this level, this 0.001 level. And in addition, there was no evidence in the record, IntelliPoint doesn't even make the claim and didn't make the claim before the commission, it doesn't make the claim here that it couldn't recover its costs. The commission pointed out at footnote 375, I believe, that the supporting amici here, although they made that claim, they presented no data to substantiate it before the commission. Similarly, the ACAM broadband commission or association that's referenced in the briefs, they didn't present data to show that their costs were higher. So the commission had nothing that would lead it to think that there were higher costs. And in addition, it had from US Telecom in a number of different pleadings, including a May 2020 letter, a June 2020 letter, the US Telecom's initial rate cap proposal. In all of those pleadings, US Telecom told the commission that this rate would be sufficient to allow carriers to recover legitimate costs. What about in footnote, I mean, maybe your position is that yes, there will be some providers with above, far above average costs. And they're just, you know, that's a competitive environment, they're going to be out of out of luck. Is that part of your position? It doesn't mean that the tariffed providers will not be able to recover? No, Your Honor, that's not our position that the commission recognized it at paragraph 115 of the order, I think that the rate should be adequately compensatory. But it had reason it on this imperfect record, it had enough, it believed and reasonably believed that this proposed rate would be adequately compensatory. And is that because the so for a provider like Orion, as you were referring to in footnote 375, you know, they say, well, we sort of have put cost information before the commission, because the cost study that justified our tariff rate, which was, I gather, 4 cents was, you know, the basis for the approval. So they're saying, you know, this is this is really cutting us off at the knees. And then as you point out, in paragraph 115, you say each carrier will have the opportunity to recover its costs. And what is the assumption that a carrier like Orion in the intervening period has gone more to IP rather than and therefore, its costs are actually radically lower as a as a practical matter? Or is there something else going on? That might well be the case, Your Honor. But I think the other piece of this and some of the earlier questioning alluded to this is that the fact that a rate is deemed lawful under the commission's tariffing system doesn't necessarily include a robust analysis of costs. I'll agree that Orion's cost data is the only evidence in this record at all commission, I think reasonably anticipated that that was an outlier in light of these many, many much lower rates. And, of course, intelligence proposed rate cap wouldn't have allowed Orion to recover its claimed costs either. So I think even intelligent can't reasonably contend that Orion's cost should have been the basis for the commission's chosen rate cap, a reasonable rate cap need an account for the individual costs of every provider in the market. What the commission had to do was consider was this rate likely to be good enough for the vast majority of providers. And for the reasons I was articulating the commission and a few others I can get to, but the commission thought it was. And if there is, and I don't concede that this is the case with Orion, because, you know, that's that Orion's claimed costs should be taken as, you know, as proved, but Orion would have the opportunity if its costs were unusually high. And my understanding is Orion is kind of a uniquely situated provider in the way that it has set up its network, but it could come to the commission and seek a waiver if this rate cap wasn't adequately compensatory. That's not relying on the waiver to justify the reasonableness of the rate cap. Yeah, that is a question I had. I mean, is the agency relying on the availability of waivers to justify the reasonableness? I mean, you're saying that it's not relying on that availability? No, Your Honor. Well, I think what the agency has to determine and explain why it has determined is that this rate cap is likely to be adequately compensatory for everyone or almost everyone. And that if there is some exception, some unanticipated exception to that general rule, that there is a backstop mechanism available. And that's all the waiver is. And I'd like to- But the backstop can't be a reason why a general rule is reasonable or a general rate is reasonable, can it? That's correct, Your Honor. But I think it does address the- I think this court has looked in other cases to the backstop as a means if there is- I believe the case is Woco Radio. I may not have the call signed quite correct. But the agency, it won't always be possible for the agency to account for every last possible outlier in setting a general rule. And if there is some exception and the agency has in place a mechanism to accommodate the possibility of such exceptions, that does support the reasonableness of the rule. So long as the rule- So you are relying on the availability of a waiver as one of your arguments for the general rate to be reasonable. I mean, that argument strikes me as pretty difficult, frankly, for the agency. If the rate is reasonable, even if there were no waiver mechanism here, I think the agency would have adequately justified the compensatory nature of this rate cap. Because as I said, Orion's claimed costs have not been proven. They were the only claim of any costs by any provider that were higher than the proposed rate cap. And in that context, I don't think the agency reasonably needed to set its rate cap based on that claim. And in fact, IntelliCoin doesn't think the agency reasonably needed to do that either, since its own proposed rate cap wouldn't have accounted for that. Again, the agency had here, what did it have to let it, you know, what are we relying on to support the conclusion that this rate cap was reasonable? We have many instances of much lower rate caps in that footnote. By the way, many of those carriers, I might mention, I think all of them referenced in footnote 216, do not have long distance businesses. So these are not the kinds of carriers that could be accused of cross-subsidizing by paying lower rates as long distance providers. We have representations from U.S. Telecom that this was an above cost rate. We have, as Judge Ginsburg was pointing out, the varied membership of U.S. Telecom, large carriers, small carriers, rural rate of return carriers, carriers that own tandem switches, all of those carriers agreed that they could continue to provide service within this rate cap. And we have no evidence from anyone else that they couldn't. We have no current cost data, as IntelliCoin agrees here today. And we have, in addition, a carrier bandwidth that was not a member of U.S. Telecom that also supported the rate cap. Senator, is the commission obliged by law or is it its consistent policy to make sure that a rate cap accommodates every regulated firm? Not every regulated firm, Your Honor. So the rate cap, I mean, assume there's no waiver provision. If there's some companies that cannot function under the rate cap, they simply lose out. I think that's right. Okay. I mean, this is, you're trying to move the industry towards VOIP. And there's going to be some legacy carriers, just as there were with airlines and with every other industry that either was deregulated and had a rate cap set by competition or a rate cap set by a commission. There are going to be some who cannot adapt to the next technology. That's right, Your Honor. And I just add that on this record, there's no evidence that that would be many. And in fact, no carrier has thought of waiver. It's just you're not obliged to set a rate that will cover every regulated firm. That's right, Your Honor. I thought the scheme was to benefit consumers, actually. Yes. No, I think that gets it just right. And so for all of those reasons, if there are no further questions from the court, I'd ask that the petition for review be denied. Thank you, Ms. Citrin. And now we'll hear from Mr. Horvitz for U.S. Telecom. Thank you, Your Honors, and may it please the court. Kevin Horvitz on behalf of U.S. Telecom. The FCC was right to conclude that U.S. Telecom's proposed rate cap was likely to reduce the incentive to make artificial toll-free calls while also providing sufficient compensation for telephone companies that offer legitimate services. I'd like to address just two points that the court has asked about here today. First, as the FCC noted, U.S. Telecom's proposal was a consensus proposal on behalf of all of its members, not just a few large ones. That coalition of companies includes both incumbent and competitive providers of all sizes. That's in the record. It's right in the first sentence of U.S. Telecom's proposal at JA-249 and at JA-259. And all of those members agreed that the rate was adequately compensatory and would serve as a meaningful deterrent to artificial toll-free calls. That includes companies, many members that only provide tandem services on toll-free calls and do not purchase them, that could not conceivably profit from a below-cost rate for tandem services. And the second point I'd like to touch on is the commission's rationale for selecting a rate that would be... Do you have a cite for, I'm sorry, do you have a cite for that last point that it includes many who only provide tandem services? Is there Windstream's August 5th, 2020 ex parte at three is making a representation on behalf of Frontier and Windstream. And it says, because neither Frontier nor Windstream sells retail inter-exchange services, the companies would not enjoy any offsetting reduction in payment of access charges. And you're at JA? It's not in the joint appendix, but it is in the record that is part of the proceeding. That specific citation was not cited in the briefs, but it is because it was an undisputed proposition. US Telecom includes many other members that do not sell retail inter-exchange services as well, including small rural carriers as well. So I just, I wanted to just... Your second point, I'm sorry, I interrupted you. You had a first point that it was a consensus proposal, and then you were going to move on to a second point. Yes. The second point is that the commission's rationale for selecting a rate that would be a better deterrent to artificial calls is explained in a lot of detail earlier in the order, and that's paragraphs 16 through 44 and 55, when they discuss the need to transition end office charges to bill and keep. And the commission explains that if they were to transition end office charges without lowering tandem rates, based on its past experience, that would be likely just to fuel arbitrage with respect to tandem calls. And so the rate IntelliQuint proposed was not designed to deter that arbitrage. It was simply designed to ensure that it would not lose revenues. So if the court has no questions, we ask the court to deny the petition for review. My colleagues have further questions. I take it, Mr. Horvitz, that the... Going to your point about deterring arbitrage, that arbitrage is better, is better, is more reduced to the extent the rate is reduced. Is that correct? Yes, that's absolutely right. It's just a matter of simple economics. The lower the rate is, the less room for arbitrage. Any reason to think that the one cent will eliminate all arbitrage? I think that it will have a significant effect in deterring arbitrage. I think any rate that is above cost, there's always some possibility for arbitrage, but this is much lower than the rates that were in existence that significant revenue sharing had occurred at that had led to all of these problems, like the generation of artificial calls. What's the final destination for this regulatory transition? I think that's something that the commission is still considering. I think that, obviously, the commission is contemplating going towards bill and keep, and there are further details that need to be worked out with respect to that transition, but that would be a system in which carriers are not relying on other carriers, but are relying on commercial arrangements, or rather than paying their customers for the privilege of completing their calls, are getting paid for providing services. Some different form less reliant on inter-carrier compensation. Am I correct in understanding that IntelliQuint is partially, but not fully moved to IP? I am not entirely sure exactly what IntelliQuint's system is, so I don't want to assume that they are using IP networks as well. I'll ask counsel for an example. Can I just ask you as a practical matter, eventually, if the FCC does move to bill and keep, is there some thought that a lot of these tandem service providers will not be commercially feasible? No, I think that there are different costs of providing service, and that could be the commercial arrangements with long-distance carrier, or with the party that is sending in the traffic currently. I guess I'm just asking, is that sort of what's going on here? Is that eventually these services are going to become obsolete? Is that part of the concern here? I don't think necessarily they'll be obsolete, but during the transition to IP networks, I do think that these services are becoming less relied on. And isn't it at the end of the day, there still will need to be some kind of service, or everybody can just do it themselves? I thought the assumption was that the different providers in the chain would just have to contract with one another, rather than do a rate-based business model. Right, so I think that both situations could occur. I think that there could be commercial arrangements to the extent that they are continuing to rely on this intermediary player, but I also think with the transition to IP networks, you could basically skip the intermediary entirely and route directly to the long-distance carrier. Thank you. Other questions from my colleagues? No, thank you. All right, thank you, Mr. Horvitz. And Mr. King, we reserved a couple of minutes for you for rebuttal, and proceed when you're ready. Thank you, Your Honor. I'll start with the just sort of factual question on what Service IntelliQuint provides and other companies like IntelliQuint provide. They provide a mix of legacy TDM service and IP service, and really the mainstay of what they do is they convert one to the other and ship it on to the wireless companies like T-Mobile, for example, and small rural carriers whose network is set up in TDM. That's how they operate. They don't have their own facilities to do IP, and so where companies like IntelliQuint come in is they make that conversion. They get the traffic into the modern IP format and send it on to the rest of the network. If the traffic's going the other way, do I need you still to step it down into non-IP signals? Correct, yeah. To get a call to a wireless, you need to step it down, is my understanding. And so contrary to what Mr. Horvitz said, you can't just take the converters out of the process. The network wouldn't function in that scenario. Are there places in the country that just rely on TDM? I assume there are, or not. I think I'd rather not speculate on that. My understanding is they're sort of small rural carriers where everything is in TDM, but I'm not 100% sure on that. And then again, the wireless providers, a lot of them don't have, their network's not in TDM. So that's the factual scenario. Let me go to sort of the legal point, and Judge Ginsburg, from what you were saying. The FCC's order does not say lower is better, and therefore U.S. Telecom's proposal is better than IntelliQuint's. That might be a rationale that they could give on remand, but that's not the rationale in the order. Why? Because the order arbitrarily dismissed IntelliQuint's data on cost grounds and never really grappled with it when looking at current rates. All we're asking for here is for the FCC to treat our data, which is situated similarly to U.S. Telecom's, in an equal, even-handed manner and to consider them both as this court's precedents require. So that explanation is not there. Maybe it's one they could give. As far as what model would better serve consumers, I agree that that's the metric here. But again, there's no finding from the commission that U.S. Telecom's would better serve consumers or just that lower is not better because if you go too low, you're going to drive out the competition that's necessary to drive down the rates. The introduction of competitive carriers like IntelliQuint here has driven down those rates because there's competition from the incumbents that otherwise were providing this service. So there is a consumer orientation here to the procedural requests that we're making. It's notable that the FCC, you know, you just heard argument from their counsel, doesn't dispute that the order is inconsistent in its treatment of our data and U.S. Telecom's. It's also notable, you've never heard at any point in this case from the FCC, that our data presents the kinds of arbitrage concerns that motivated the order. You know, the traffic that we're studying doesn't present those concerns. All right. Go ahead. If you had just a sentence you wanted to use to wrap up, that's fine, but I think otherwise we're well over time. I appreciate it, your honors. All we're asking for here is a reasoned explanation. And because the order doesn't give it, we urge that the rate cap should be set aside and the matter remanded to the FCC. Thank you, your honors. Thank you all for an illuminating and well-supported set of arguments. Case is submitted.
judges: Pillard, Rao, Ginsburg